IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BERNARD CAMPBELL,                          *

    Plaintiff,                          *

v.                                         *          Civil Action No. GLR-23-2021

DR. KASAHUN TEMESGEN, et al.,              *

    Defendants.                         *
                                ***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants YesCare Corp. ("YesCare"), Dr. Kasahun Temesgen, and Dr. Robert Williams' Motion to Dismiss, or in the Alternative for Summary Judgment (ECF No. 19), Plaintiff Bernard Campbell's Motion to Appoint Counsel (ECF No. 24), and Campbell's Motion Seeking Understanding of Disposition (ECF No. 40).[1] The Motions are ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motion, construed as one for summary judgment, and deny Campbell's Motion.

## I.  BACKGROUND

### A.  Campbell's Allegations

#### 1.  Claims regarding prescription for Tramadol

Self-represented Plaintiff Bernard Campbell is a state prison inmate currently housed at Jessup Correctional Institution ("JCI") in Jessup, Maryland. (Compl. at 1, ECF

---

[1] Because this Opinion fully adjudicates Campbell's claims, his Motion Seeking Understanding of Disposition shall be granted.

No. 1). Campbell alleges that on May 12, 2022, Temesgen discontinued his prescription for Tramadol because Campbell's medical history indicated he was at an increased risk of seizures while taking the medication. (Id. at 2.)[2] On May 16, 2022, Campbell visited Dr. Williams to have his Tramadol prescription renewed. (Id.).

On July 28, 2022, the "Pain Committee" renewed Campbell's Tramadol prescription. (Id. at 3). Campbell had a seizure in February of 2023, two months after Temesgen and Williams increased Campbell's Tramadol prescription. (Id.). Campbell was hospitalized for several days after the seizure and a neurologist recommended he stop taking Tramadol. (Id.). Campbell asserts that Dr. Temesgen was deliberately indifferent to his serious medical needs by prescribing Tramadol despite his heightened risk of seizure and failed to advise him of the risks of taking Tramadol. (Id.). He also says that he must now take anti-seizure medication for the rest of his life. (Id.).

### 2.    Claims regarding straps for leg braces

Campbell also states that he needs new straps for his leg braces. (Id. at 4). Campbell submitted sick call slips regarding this issue and saw Williams, Temesgen, and other providers as a result. (Id.). Providers submitted consultation requests for him to go to

---

[2] On August 1, 2022, Campbell filed a civil rights complaint against Temesgen alleging, among other things, that Temesgen's discontinuation of Tramadol violated his rights under the Eighth Amendment. (Campbell v. Warden, et al., No. GLR-22-1893, Compl. at 1, ECF No. 1). The Court granted Dr. Temesgen's motion for summary judgment in that case finding that he was not deliberately indifferent to Campbell's serious medical needs when he stopped Tramadol because Dr. Temesgen "presented evidence that the decision not to renew the medication was based on his professional belief regarding Campbell's best interests, and when Campbell's physicians discerned that his pain was not managed well without Ultram/Tramadol, they restarted the medication." (Campbell v. Warden, et al., No. GLR-22-1893, Mem. Op. at 27–28, ECF No. 58).

Hanger Orthopedics, but that has not occurred, nor has he been provided with new straps. (Id.). Campbell says that "YesCare and their medical department know about this as well." (Id.).

**B.   Defendants' Response**

**1.   Campbell's Medical Records[3]**

On May 22, 2019, Harjit Bajaj, M.D., a neurologist at Bon Secours Hospital, saw Campbell for a follow-up visit regarding his Charcot-Marie-Tooth disease ("CMT"). CMT is "a kind of hereditary sensorimotor polyneuropathy." (Medical Rs. Part 6 at 14, ECF No. 19-8). Campbell could not walk and came to the appointment using a wheelchair. (Id.). He suffered from bilateral footdrop and demonstrated significant atrophy of muscles in both lower extremities below the knee, including both feet. (Id.). While Campbell showed normal strength in his upper extremities, he had muscular atrophy there as well. (Id.). Campbell did not have reflexes in his biceps, triceps, ankles, and knees. (Id.). Campbell told Bajaj that his symptoms had worsened, and he was losing muscles in his hands and feet. (Id.). He asked what else could be done regarding his condition, but Bajaj advised Campbell on the progressive nature of CMT and the lack of available treatment—the only

---

[3] Defendants attached 906 pages of medical records to their motion as "Exhibit A-1." The records are docketed as twenty-three separate attachments. The records will be cited as they appear on the Court's electronic docket with the document and page number assigned by the Court's electronic case filing system. Some of the medical records scanned into the Court's electronic record were not legible on the docket. (See ECF Nos. 19-11, 19-12). The Clerk directed counsel to resubmit the documents, which they did at (ECF Nos. 35-1, 35-2), but they remained unreadable. The Clerk issued a second deficiency notice, and counsel again docketed those portions of the medical record in (ECF No. 38). Those portions of the medical record will be referred to as "Refiled Medical Records."

thing to do was manage the symptoms. (Id.). Bajaj continued Campbell's prescriptions for Tramadol to address pain and numbness, and Neurontin[4] for "symptomatic symptoms." (Id.). Additionally, Bajaj directed that physical therapy be continued and noted that Campbell should be provided a personal wheelchair because he could not walk and his muscles were wasting. (Id.).

Campbell received bilateral ankle foot orthoses on August 15, 2019. (Temesgen Decl. ¶ 7).

On March 19, 2021, Hamid Kiabayan, M.D. examined Campbell during a chronic care visit. (Refiled Medical Rs. Part 3 at 14, ECF No. 38-3). Campbell complained of neck and back pain, and also requested replacement of the strap and pad for his ankle/foot orthoses. (Id.). On March 22, 2021, Kiabayan submitted a request for replacement of the strap and pad for the ankle/foot orthoses and Campbell received them on April 1, 2021. (Id. at 12, 13)

On July 9, 2021, Dr. Kiabayan saw Campbell again for a chronic care visit. (Refiled Medical Rs. Part 2 at 39, ECF No. 38-2; Refiled Medical Rs. Part 3 at 1–2). At that visit, Campbell used his wheelchair and complained of chronic and worsening back pain. (Refiled Medical Rs. Part 3 at 1, ECF No. 38-3). He asked Kiabyan to increase his pain medication, but Kiabayan explained that Campbell was already prescribed a high dose of the medication and did not believe there would be any benefit in increasing the dose. (Id.).

---

[4] Neurontin (also known as Gabapentin) "is an anticonvulsant that lowers the risk of seizures and is also used to treat nerve pain."  (Temesgen Decl. ¶ 6, ECF No. 19-2).

Instead, Kiabayan directed Campbell to engage in stretching and core exercises to increase muscle strength. (Id.). He also advised Campbell not to sit in his wheelchair all day. (Id.).

On September 15, 2021, Nurse Practitioner ("NP") Bernard Alenda examined Campbell for a provider sick call. (Refiled Medical Rs. Part 2 at 33). Alenda noted Campbell's history of cervical spine stenosis and CMT, use of a wheelchair, and complaints of worsening pain in the left arm and shoulder. (Id.). Campbell had muscular atrophy from CMT and was already taking Tramadol. (Id.). Alenda added Baclofen, a muscle relaxer, to further address Campbell's pain. (Id.).

On October 1, 2021, Alenda treated Campbell again during another provider sick call. (Id. at 31). Campbell had active prescriptions for Tramadol, Neurontin, and Baclofen. (Id.). He described worsening pain, mostly in the left shoulder and arm, and advised that the Baclofen upset his stomach. (Id.). Alenda discontinued the Baclofen and increased Campbell's prescription of Neurontin to 600 mg three times per day. (Id.).

On October 15, 2021, Williams saw Campbell for a chronic care visit. (Williams Decl. ¶ 8, ECF No. 19-26; Refiled Medical Rs. Part 2 at 28–29). Williams observed severe muscle wasting in both lower extremities. (Williams Decl. ¶ 8). Campbell reported numbness and pain in both upper extremities, chronic pain in the lower extremities, and pain in his neck and back. (Id.). Nevertheless, he said that he was receiving adequate pain relief on his prescription regimen. (Id.). As such, Williams continued Campbell's prescription for Tramadol 50 mg, two tabs, twice per day. (Id.).

Williams next saw Campbell on May 16, 2022. (Medical Rs. Part 8 at 9, ECF No. 19-10). Williams addressed Campbell's concerns regarding an unrelated medical issue.

(Id.). As to Campbell's CMT, Williams described Campbell as "wheel chair bound with all 4 extremities severely affected." (Id.). Williams submitted a non-formulary drug request ("NFDR") for Neurontin and Tramadol. (Id.). These medications required approval from the Regional Medical Director ("RMD"), Temesgen. (Temesgen Decl. ¶ 13). On May 17, 2022, Temesgen approved the NFDR for Neurontin but denied the request for Tramadol. (Id.).

On July 12, 2022, CRNP Ikanke Edem saw Campbell for a provider sick call. (Medical Rs. Part 8 at 2). Campbell asked for new leg braces, and Edem placed a request for new braces. (Id.).

On July 18 and 28, 2022, Williams saw Campbell for chronic care visits. (Refiled Medical Rs. Part 1 at 22–26, ECF No. 38-1). Campbell had severe muscle wasting of both the upper and lower extremities, was wheelchair bound, and described his CMT as "very painful." (Id. at 22). At the July 28, 2022, visit, Williams noted that Tramadol was previously discontinued but the Pain Committee had already reinstated it. (Id.). Accordingly, Williams prescribed Campbell Tramadol 50 mg, two tabs twice daily. (Id.).

Williams next saw Campbell on September 22, 2022, for a chronic care appointment. (Refiled Medical Rs. Part 1 at 14–17). Campbell continued to suffer from muscle wasting in both the upper and lower extremities and he used a cane to walk. (Id. at 15). Williams renewed Campbell's Neurontin prescription. (Id.).

On October 29, 2022, NP Aryiku treated Campbell during a provider sick call. (Medical Rs. Part 11 at 16, ECF No. 19-13). Campbell told Aryiku that in September, a provider told him that a consultation would be placed for him to get new shoe straps, but

he had not heard anything. (Id.). He also asked to be rescheduled with the podiatrist. (Id.).

Aryiku sent a request to the scheduler regarding the podiatry appointment but also noted

that she did not see a request for Hanger Orthopedics, the company that would replace the

straps, and so she referred Campbell to his chronic care provider. (Id.).

Campbell last saw Williams on December 2, 2022. (Refiled Medical Rs. Part 1 at

4–7). Campbell continued to complain of pain in his extremities, so Williams increased

Campbell's Tramadol dose to 50 mg three times per day and continued Neurontin as

prescribed. (Id.). Williams also submitted the NFDR for Neurontin and Tramadol, and

Temesgen approved it. (Id.; Temesgen Decl. ¶ 18).

On February 21, 2023, Campbell was found unresponsive in his housing unit.

(Medical Rs. Part 18 at 16–17, ECF No. 19-20). Campbell received Narcan but remained

difficult to arouse. (Id.). The on-call doctor ordered that Campbell be taken to the

emergency room. (Id. at 17).

Campbell was admitted to Howard County General Hospital from February 22–24,

2023. (Medical Rs. Part 17 at 8, ECF No. 19-19). According to Dr. Mahwish Shakil

Khurram's hospital discharge summary, Campbell arrived at the hospital with an altered

mental status and did not recall the events that resulted in him being in the emergency

room. (Id. at 9). Khurram observed a mild right facial droop and that Campbell only

responded to noxious stimuli. (Id.). The cause of Campbell's unconsciousness was not

clear, and Campbell could not provide details. (See id. ("CT scan of the head found no

acute intracranial abnormality, CT Perfusion protocol found no infarct.")). Given

Campbell's medical history, the emergency room physician suspected a seizure. (See id.

("He was given keppra for presumed seizure with prolonged ictal period.")). Neurology recommended starting Keppra 1000 mg BID and stopping Tramadol because it lowered seizure threshold. As an alternative to Tramadol, Khurram directed Campbell to increase Neurontin and to take Tylenol. (Id.). He also recommended avoiding stronger opiates because of their risk of addiction. (Id.). As to Campbell's CMT, the discharge instructions directed him to continue with leg braces, supportive care, Neurontin, and Tylenol. (Id.).

On March 8, 2023, Dr. Yonas Sisay examined Campbell during a provider chronic care visit. (Medical Rs. Part 18 at 36–39, ECF No. 19-18). Sisay reviewed and noted the hospital findings and discharge recommendations. (Id.). He observed that Campbell had a loose strap on his leg brace. (Id.). Sisay adjusted Campbell's Neurontin prescription, reordered his other medications, discussed the previous scrotal ultrasound, and submitted a consultation request for Hanger Orthopedics to replace the brace straps. (Id.). Temesgen approved the NFDR for Neurontin 600 mg. (Temesgen Decl. ¶ 22).

On June 5, 2023, Campbell met with the JCI Health Services Administrator ("HSA") Nicole Hargraves, the Patuxent Correctional Institution HSA Damon Fayall, and the Jessup Regional Director of Nursing Zoe Badu regarding an Administrative Remedy Procedure ("ARP") he submitted wherein he complained that Tramadol caused him to have a seizure. (Temesgen Decl. ¶ 23; Medical Rs. Part 21 at 25, ECF No. 19-23). Campbell was informed that the Pain Committee originally made the decision to prescribe Tramadol: "the Pharmacist, [Temesgen], and evidence-based information show[ed] that one of the side effects of this medication is seizures." (Medical Rs. Part 21 at 25). Campbell was advised, however, that the dose he was prescribed was not likely to cause a seizure. (Id.).

He was also told that the providers were certified and trained and understood medications and their side effects. (Id.).

On June 27, 2023, Campbell met with the JCI HSA again. (Id. at 24). The HSA examined the leg brace and determined that the Velcro straps did not stick as they once did. (Id.). The brace had worn out—it did not have the same strength and support as before and was not at its maximum efficiency. (Id.). Additionally, the cushions were becoming worn. (Id.). An order was placed for Campbell to obtain a new leg brace. (Id.).[5]

On July 6, 2023, Campbell met with the Pain Committee, comprising of Temesgen, the Clinical Regional Pharmacist, and other pharmacists and providers. (Id. at 20). Campbell reported severe pain in his neck and back, and the Pain Committee noted his history of cervical spine disease and CMT disease. (Id.). Campbell said that his prescription for Neurontin was not strong enough to relieve his pain, and the Tramadol was discontinued in February because of its aggravation of his seizure disorder. (Id.). Campbell requested a replacement of the Tramadol. (Id.). The Pain Committee recommended Oxycodone 5 mg twice daily and a pain management consultation. (Id.). Aryiku submitted a consultation request for the pain management consultation, which was approved. (Id. at 15, 17). She also submitted an NFDR for Oxycodone 5 mg, which Temesgen approved. (Id. at 16).

---

[5] The Court received correspondence from Campbell on May 3 and May 17, 2024, stating that as of those dates, he had not received new leg braces or straps as directed by multiple providers. (ECF Nos. 33, 37). The May 17, 2024, letter will be docketed as a new civil rights complaint. Campbell will be granted an opportunity to amend the Complaint to identify proper parties and further articulate his claim. Counsel for YesCare will be directed to show cause as to why Campbell has not been provided the leg braces/straps as requested by his medical providers.

On July 28, 2023, Campbell saw NP Cynthia Okonkwo for renewal of his pain medications. (Id. at 10). At that time, Campbell reported significant improvement of pain while taking Oxycodone. (Id.). On July 31, 2023, Okonkwo submitted a NFDR for Oxycodone 5 mg, and Temesgen approved it. (Id. at 7). On October 5, 2023, Aryiku submitted another NFDR for Oxycodone 5 mg, and Temesgen approved it again. (Medical Rs. Part 23 at 3, ECF No. 19-25).

On October 10, 2023, Johns Hopkins Medicine Pain Management evaluated Campbell and added o new medications to his treatment regimen. (Id. at 1). However, they did recommend that physical and occupational therapy be considered. (Id.).

### 2. Temesgen's Role

Temesgen, a licensed medical doctor, explains that he is the RMD for the Jessup Region, which includes JCI. (Temesgen Decl. ¶ 2). Dr. Temesgen has served as RMD since January 1, 2019. (Id.). He was previously employed by Corizon Health, Inc., and is now employed by YesCare. (Id.).

Temesgen is a member of the Pain Committee, a panel that reviews the medical records and formulates treatment plans for inmates who suffer from chronic pain. (Id. ¶ 5). Temesgen cannot, as a member of the Pain Committee, unilaterally start or discontinue pain medication—those decisions require a consensus of the committee. (Id.).

Regarding Campbell's prescription for Tramadol, Dr. Temesgen explains that he initially denied the NFDR for Tramadol because a number of inmates had overdosed, resulting in an altered mental state and visits to the emergency room. (Id.). Accordingly, the medical department sought to reduce the inmates' overall use of opioids for safety and

security reasons. (<u>Id.</u> ¶ 14). He also initially denied the renewal of Tramadol because Campbell's medical history placed him at an elevated risk for seizure and Tramadol reduces the threshold for seizures. (<u>Id.</u>).

Ultimately, on July 28, 2022, the Pain Committee renewed Campbell's prescription for Tramadol after considering the risks and benefits of doing so. (<u>Id.</u> ¶ 28). Temesgen explains that the Pain Committee believed that the potential benefit of pain relief outweighed the relatively low increased risk of a seizure (<u>Id.</u>). Additionally, Temesgen notes that the Pain Committee "prescribed Neurontin, which lowers the risk of seizures and was prescribed to counteract the slightly increased risk of seizure with Tramadol." (<u>Id.</u> ¶ 23). Temesgen also explains that Campbell demanded Tramadol and had previously sued Temesgen when he refused to renew the prescription in May of 2022. (<u>Id.</u>).

As to Campbell's need for new leg straps or braces, Temesgen denies ever being informed that Campbell required new straps for his leg braces. (<u>Id.</u> ¶ 29). Temesgen was not Campbell's medical provider and did not see him for that issue. (<u>Id.</u>). Temesgen explains that the sole purpose of his teleconference with Campbell on July 28, 2022, was to discuss Campbell's pain management. (<u>Id.</u>). Lastly, Temesgen offers that he defers to Campbell's regular medical providers who are responsible for addressing Campbell's other medical issues. (<u>Id.</u>).

### 3.   Williams' role

Williams is a medical doctor who worked at JCI as a Corizon employee from June 5, 2019, to May 4, 2022, and as a YesCare employee from May 4, 2022 until February 14, 2023. (Williams Decl. ¶ 2). Williams explains that he considered the risks and benefits of

Tramadol before prescribing it to treat Campbell's pain, and when he prescribed an increase in the dosage. (Id. ¶ 15). Williams avers that the dose of Tramadol prescribed was sufficiently low that it was unlikely to cause a seizure. (Id.). Williams concurs with Temesgen that the pain relief benefits of prescribing Tramadol outweighed the increased risk, particularly given that Campbell had taken Tramadol for years without incident and had reported good pain control with its use. (Id.).

Williams does not recall Campbell ever informing him that he needed new straps for his leg braces. (Id. ¶ 16). Williams explains that his regular practice is to record a patient's subjective complaints in the contemporaneous notes he takes during a visit. (Id.). Williams reviewed Campbell's medical records and did not see any note documenting that Campbell reported to him the need for new straps. (Id.). If Campbell requested new straps, Williams avers he would have documented Campbell's request in his notes and then submitted a request that new straps be provided. (Id.).

## C.   Procedural History

Campbell filed this case on July 26, 2023, under 42 U.S.C. § 1983. (ECF No. 1). On November 13, 2023, Defendants YesCare Corp. ("YesCare"), Temesgen, and Williams filed a Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (ECF No. 19). The Court notified Campbell of his right to oppose the motion. (ECF No. 20). He filed a request for appointment of counsel and notified the Court that he had not received a copy of Defendants' dispositive motion. (Mot. Extension Time and Appoint Counsel at 1–2, ECF No. 21). The Court denied the request for an attorney without prejudice, and it directed Defendants to resend the dispositive motion to Campbell. (November 30, 2023 Order at 1–

2, ECF No. 22). On December 1, 2023, Defendants remailed their dispositive motion to Campbell. (ECF No. 25).  Campbell filed a second Motion to Appoint Counsel (ECF No. 24), and responded to the dispositive motion, (ECF Nos. 28, 29, and 33). The Motion to Appoint Counsel will be denied without prejudice for the reasons stated in the Court's November 30, 2023 Order.

## II.     DISCUSSION

### A.     Standards of Review

#### 1.     Conversion

Defendants' Motion is styled as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for Summary Judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80

F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Campbell was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Campbell about the Motion and need to file an opposition, and Campbell did Oppositions without requesting discovery or arguing against conversion. (ECF Nos. 23, 28).

Because the Court will consider documents outside of Campbell's Complaint in resolving Defendants' Motion, the Court will treat the Defendants' Motion as one for summary judgment.

### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan,

526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3.    Motion to Dismiss

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible

on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v.</u> <u>Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994); <u>Lambeth v. Bd. of Comm'rs</u>, 407 F.3d 266, 268 (4th Cir. 2005) (citing <u>Scheuer v.</u> <u>Rhodes</u>, 416 U.S. 232, 236 (1974)). Complaints drafted by self-represented plaintiffs are held to a less stringent standard than those drafted by attorneys, and courts must liberally construe these complaints. <u>See</u> <u>Johnson v. Silver</u>, 742 F.2d 823, 825 (4th Cir. 1984). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678.

B.   **Analysis**

1.   **Eighth Amendment**

Campbell alleges that Defendants failed to provide him adequate medical care. The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; Gregg v. Georgia, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide

diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir.

1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew of at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

### a.    Tramadol Prescription

The record shows that Temesgen and Williams were not deliberately indifferent to Campbell's medical needs in regard to prescribing him Tramadol. Campbell suffers from CMT, a progressive neurogenic disease which results in muscle wasting and pain. He was prescribed Tramadol and Neurontin to treat the pain associated with this disease. Both prescriptions were non-formulary and required the approval of Temesgen as RMD. In May of 2022, Dr. Temesgen denied a request to renew Campbell's prescription for Tramadol because its use was disfavored within the correctional setting and because Campbell had a history of brain injury which placed him at a greater risk of a seizure which was further

raised by using Tramadol. Without Tramadol however, Campbell's pain was not well controlled. He regularly sought additional pain relief, which his physicians attempted to provide by prescribing Baclofen and increasing Campbell's Neurontin. Ultimately, Campbell's care plan was considered by the Pain Committee, who, after weighing the risks and benefits, decided to approve the use of Tramadol. Campbell's medical providers, including Temesgen and Williams, believed that the benefits of using Tramadol to control Campbell's pain exceeded the relatively low risk of increasing the likelihood of seizure. Campbell's prescription for Neurontin, which lowers the overall risk of seizure activity, further bolsters this balancing of risks and benefits. Unfortunately, Campbell suffered what appeared to be a seizure. When the neurologist who treated him recommended Tramadol be discontinued, it was. After the discontinuation of the Tramadol, Campbell's treatment team increased his Neurontin prescription. His pain, however, could not be well controlled with Neurontin alone and ultimately the Pain Committee added Oxycodone to Campbell's medication regimen.

On this record, the Court cannot say that Temesgen and Williams acted with deliberate indifference to Campbell's serious medical needs when they prescribed Tramadol to address Campbell's persistent complaints of pain. To the contrary, the record reflects that Campbell tolerated Tramadol well for many years, and only when his treatment team discontinued it based on institutional safety concerns and Campbell's history of head injury did Campbell's pain escalate. Campbell requested that his prescription for Tramadol be restarted and ultimately, taking into consideration the risks and benefits of prescribing Tramadol, Campbell's treatment team collectively determined that the use of Tramadol

outweighed the additional low risk to Campbell its use presented. Rather than demonstrating deliberate indifference, Temesgen and Williams endeavored to treat Campbell's persistent and progressive pain effectively. Campbell apparent seizure is unfortunate, but alone it does not show that either Temesgen or Williams were deliberately indifferent to his serious medical need.

### b.      Replacement of Leg Straps

As to the replacing of Campbell's leg straps, there is no evidence that either Temesgen or Williams were aware that Campbell required new leg straps and therefore neither physician was deliberately indifferent to Campbell's serious medical need. As to Temesgen, he is the RMD and not the physician responsible for providing or overseeing Campbell's day to day care. Temesgen avers that he was not aware that Campbell needed new leg straps and would have deferred to Campbell's providers to arrange for the replacement of the straps. Williams, for his part, has no recollection of Campbell requesting new straps and avers that had Campbell made him aware of the need for new straps, he would have placed the order. The record supports Temesgen and Williams' recollection of their interactions with Campbell because there is no evidence in Campbell's medical records that he ever addressed the need for new leg straps to either physician.

To the contrary, on July 12, 2022, Edem noted that she placed a request for new leg braces. In October of 2022, Ariku could not locate the request for a consultation with Hanger Orthopedics for new braces/straps, and referred Campbell to his chronic care provider so that the consultation request could be considered and placed. In March of 2023, Sisay submitted a consultation request to have Campbell's brace straps replaced. Another

order for Campbell to receive new leg braces was placed by the HSA in June of 2023.  To date, it does not appear that the consultation has occurred and Campbell does not have new leg braces. Nevertheless, Temesgen and Williams had no knowledge of Campbell's need for new leg braces or straps, and were not the parties responsible for ordering the new braces or straps, or insuring they were provided, and as such they are each entitled to summary judgment on this claim.

### 2.    State law Claims

Campbell also alleges that his treatment team prescribed Tramadol without advising him on the risks of its use in violation of his right to provide informed consent. Such a claim sounds in negligence and medical malpractice under State law. Because such claims are not federal claims, this Court does not have original subject matter jurisdiction over them.

This Court has original subject matter jurisdiction over any federal claim, under 28 U.S.C. § 1331(a)(1), which "confers upon district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'" ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394 (4th Cir. 2012). However, the Court does not have original jurisdiction over Campbell's State law claims, and so the Court is only authorized to resolve those claims under supplemental jurisdiction in 28 U.S.C. § 1367(a), which provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part

of the same case or controversy under Article III of the United
States Constitution.

Under § 1367(c)(3), however, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In <u>Shanaghan v. Cahill,</u> 58 F.3d 106, 110 (4th Cir. 1995), "[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." <u>See also</u> <u>ESAB Grp</u>., 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."). "[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." <u>Hinson v. Norwest Fin. S. Carolina, Inc.</u>, 239 F.3d 611, 616 (4th Cir. 2001).

In the absence of viable claims that come within federal question jurisdiction, the Court exercises its discretion and declines to exercise supplemental jurisdiction over Campbell's claim regarding informed consent which is governed by State law. Therefore, the Maryland law claim is dismissed without prejudice to Campbell's right to pursue such claims in State court.

### 3.  Personal Participation

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal

participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727–28 (4th Cir. 1999); Clark v. Md. Dep't of Pub. Safety and Correctional Servs., 316 Fed.Appx. 279, 282 (4th Cir. 2009).

Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Campbell does not allege any facts suggesting that Defendant YesCare was personally involved in or otherwise aware of the decisions regarding the provision of medical care to Campbell. As such, YesCare is entitled to dismissal.

## III.    CONCLUSION

For the foregoing reasons, the Court grants Defendants YesCare, Temesgen, and Williams' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 19). Temesgen and Williams are granted summary judgment on Campbell's Eighth Amendment claim. Campbell's state law claim is dismissed without prejudice. Campbell's claims against YesCare are dismissed. Campbell's Motion to Appoint Counsel is denied without prejudice, (ECF No. 24), and his Motion Seeking Understanding of Disposition, (ECF No. 40), is granted.

A separate Order follows.

Entered this 12th day of July, 2024.


_____/s/_____
George L. Russell, III
United States District Judge